# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

LAURA J. BRUCE,
      Plaintiff,

   vs.

COMMISSIONER OF
SOCIAL SECURITY,
     Defendant.

Case No. 1:16-cv-758

Black, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff Laura Bruce brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3)

for judicial review of the final decision of the Commissioner of Social Security

("Commissioner") denying plaintiff's applications for disability insurance benefits ("DIB") and

supplemental security income ("SSI"). This matter is before the Court on plaintiff's statement of

errors (Doc. 7), the Commissioner's response in opposition (Doc. 14), and plaintiff's reply

memorandum (Doc. 15).

## I. Procedural Background

Plaintiff filed her applications for DIB and SSI in September 2012, alleging disability

since November 1, 2006[1] due to hearing loss, severe tinnitus, severe depression, and suicidal

ideation. Plaintiff's applications were denied initially and upon reconsideration. Plaintiff,

through counsel, requested and was granted a *de novo* hearing before administrative law judge

("ALJ") Peter J. Boylan. Plaintiff and a vocational expert ("VE") appeared and testified at the

ALJ hearing. On March 16, 2015, the ALJ issued a decision denying plaintiff's applications.

Plaintiff's request for review by the Appeals Council was denied, making the ALJ's decision the

final administrative decision of the Commissioner.

---

[1] Plaintiff later amended her alleged onset date to October 28, 2011. (Tr. 31-32, 228).

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 416.920(a)(4)(i)-(v), 416.920(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform

the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999).

## B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. The [plaintiff] meets the insured status requirements of the Social Security Act through December 31, 2014.

2. The [plaintiff] has not engaged in substantial gainful activity since October 28, 2011, the amended alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3. The [plaintiff] has the following severe impairments: bilateral sensorineural hearing loss, tinnitus, asthma, affective disorder, alcohol dependence, cannabis dependence, and personality disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The [plaintiff]'s impairments, including the substance use disorders, meet sections 12.04 and 12.09 of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 416.920(d)).

5. If the [plaintiff] stopped the substance use, the remaining limitations would cause more than a minimal impact on the [plaintiff's] ability to perform basic work activities; therefore, the [plaintiff] would continue to have a severe impairment or combination of impairments.

6. If the [plaintiff] stopped the substance use, the [plaintiff] would not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 416.920(d)).

7. If the [plaintiff] stopped the substance use, the [plaintiff] would have the residual functional capacity [("RFC")] to perform a full range of work at all exertional levels but with the following nonexertional limitations: the [plaintiff] has limited hearing but is able to use the telephone to communicate and can understand oral instructions and communication; she is able to work in environments with moderate noise level such [a]s typically found in an office; she must avoid concentrated exposure to noise, fumes, dust, gases, and poorly

3

ventilated areas; she should avoid workplace hazards; she is limited to performing simple, routine, and repetitive tasks; she is able to do goal oriented work; she can make simple work related decisions; she can have occasional interaction with coworkers and supervisors and no interaction with [the] public; and she is limited to occasional changes in the work setting.

8. If the [plaintiff] stopped the substance use, the [plaintiff] would be unable to perform past relevant work (20 CFR 404.1565 and 416.965).[2]

9. The [plaintiff] was born [in] 1959 and was 51 years old, which is defined as closely approaching advanced age, on the amended alleged disability onset date (20 CFR 404.1563 and 416.963).

10. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

11. Transferability of job skills is not material to the determination of disability because the [plaintiff]'s past relevant work is unskilled (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

12. If the [plaintiff] stopped the substance use, considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there would be a significant number of jobs in the national economy that the [plaintiff] could perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).[3]

13. The substance use disorder is a contributing factor material to the determination of disability because the [plaintiff] would not be disabled if she stopped the substance use (20 CFR 404.1520(g), 404.1535, 416.920(g) and 416.935). Because the substance use disorder is a contributing factor material to the determination of disability, the [plaintiff] has not been disabled within the meaning of the Social Security Act at any time from the amended alleged onset date through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 13-23).

---

[2] Plaintiff's past relevant work was as a kitchen helper, a medium, unskilled position. (Tr. 22, 55, 299).

[3] The ALJ relied on the VE's testimony to find that if plaintiff stopped the substance use, she would be able to perform representative medium jobs such as hand packer (8,300 jobs regionally, 168,000 jobs nationally), folder/stacker (29,000 jobs regionally, 587,000 jobs nationally), and inspector/tester/sorter (800 jobs regionally, 16,500 jobs nationally). (Tr. 22-23, 57-58).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

## D. Medical Evidence

*Hospitalizations*

In October 2011, plaintiff was transported to the emergency department at University Hospital after she attempted suicide by making two cuts on her right wrist and four cuts on her left wrist. (Tr. 317-20). These cuts were superficial except for one cut on the left arm that slightly nicked a tendon. (Tr. 317). After her physical wounds were treated, plaintiff was transferred for inpatient psychiatric treatment because she remained suicidal. (Tr. 317). Plaintiff reported that she had lost her job six months earlier and had recently lost her food stamps. (Tr. 336). Plaintiff reported trying to kill herself two years earlier by not taking her thyroid medication. (*Id.*).

On psychiatric intake, plaintiff reported to psychiatrist Gina Guadagno, M.D., that she began drinking more heavily a month earlier. (Tr. 344). She had stopped going to Alcoholics Anonymous ("AA") meetings and also reported frequent use of marijuana. Plaintiff underwent 30 days of detoxification in 2009. (*Id.*). On examination, plaintiff was disheveled, looked as though she had been crying, had a depressed mood, and was hard of hearing. (Tr. 345). Dr. Guadagno diagnosed depression and alcohol dependence and assigned a GAF score of 30.[4] (Tr. 345-46).

Plaintiff was discharged a week after she was transported to the emergency department. Psychiatrist Bryan Griffin, D.O., noted that plaintiff reported smoking 1.5 packs of cigarettes and

---

[4] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34. A GAF score of 21 to 30 is indicative of behavior "considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." *Id.*

drinking one quart of diluted vodka daily prior to admission. (Tr. 337). Dr. Griffin noted that plaintiff "really did not want to see our chemical dependency counselor, saying she knows she is alcoholic, knows what she needs to do about it, but just at times chooses not to." (Tr. 338). Dr. Griffin noted that plaintiff "does seem significantly depressed and regressed." (*Id.*). Plaintiff "pretty much stayed in her room, did not really participate in many of the groups." (*Id.*). On examination at discharge, Dr. Griffin noted that plaintiff "still remains depressed, not sure how she is going to handle things." (*Id.*). However, plaintiff was discharged because she was no longer suicidal and "[was] wanting to leave the hospital." (*Id.*). Plaintiff was discharged with prescriptions for Synthroid (thyroid hormone replacement), trazodone (antidepressant), Remeron (antidepressant), and Celexa (antidepressant). (Tr. 336).

In April 2013, plaintiff was transported to the emergency department at University Hospital after she again attempted suicide by making two cuts to her left wrist. (Tr. 864). These cuts were superficial. (Tr. 866). After her physical wounds were treated, plaintiff was transferred for inpatient psychiatric treatment because she continued to endorse suicidal ideation. (*Id.*).

On examination at psychiatric intake, plaintiff was found to have a depressed mood, flattened affect, poor grooming and hygiene, slow speech, suicidal/homicidal ideation without plan, partial insight, and fair judgment. (Tr. 880). Plaintiff was diagnosed with major depression, recurrent and was assigned a GAF score of 21-30. (Tr. 880-81). Plaintiff reported feeling overwhelmed due to financial stress, denial of disability benefits, and pending eviction. (Tr. 881). Plaintiff reported that she was not taking any medications for depression and was drinking approximately one liter of vodka daily. (Tr. 882). Plaintiff "appear[ed] to minimize [her] substance use." (*Id.*).

Plaintiff was discharged a week after she was transported to the emergency department. Psychiatric resident Neha Khariwala, D.O., and psychiatrist Michael Newton, M.D., diagnosed plaintiff with alcohol dependency and recurrent severe major depressive disorder and assigned a GAF score of 40.[5] (Tr. 886). Plaintiff reported increasing tinnitus that caused her to lose her job as a cook a year earlier. (Tr. 887). Plaintiff reported that she was being evicted from her apartment because she was behind in rent and her electricity had been turned off for three weeks. (Tr. 888). Plaintiff reported that she had stopped taking her Synthroid for several weeks in an attempt to kill herself. (Tr. 888-89). Plaintiff "continued to be depressed and suicidal" as her hospital course continued. (Tr. 888). Plaintiff "stated that she would feel better if she could stay in the hospital until she could obtain housing." (*Id.*). At discharge, plaintiff "was less depressed" and "was more engaging in conversation with more facial expression." (Tr. 889). Plaintiff agreed to go to a homeless shelter until a bed opened at a residential substance abuse treatment center that did not require an ability to pay. (*See id.*). Plaintiff was discharged with prescriptions for Synthroid, Paxil (antidepressant), and trazodone. (Tr. 886-87).

*Audiologic Evaluations*

An audiologic evaluation in June 2011 revealed hearing within normal limits in the right ear through 500 hertz sloping to a profound sensorineural hearing loss and a good word recognition score. (Tr. 421). In the left ear, the test revealed mild to profound mixed/sensorineural hearing loss and a fair word recognition score. (*Id.*).

---

[5] Individuals with GAF scores of 31 to 40 have "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." DSM-IV at 34.

An August 2012 audiologic evaluation revealed low normal to severe sensorineural hearing loss in the right ear with a fair word recognition score. (Tr. 422). In the left ear, the test revealed mild to profound sensorineural hearing loss and a fair word recognition score. (*Id.*).

A March 2013 audiologic evaluation demonstrated a sloping moderate to severe sensorineural hearing loss. (Tr. 648). Plaintiff had an excellent word recognition score in her right ear. (Tr. 649). Otolaryngologist Allen Seiden, M.D., opined that plaintiff would benefit from hearing aids. (Tr. 648).

*The Christ Hospital*

In May 2011, plaintiff complained of tinnitus to internal medicine resident Kirti Chavan, M.D., at the Christ Hospital Clinic. (Tr. 447). Dr. Chavan noted that plaintiff was seen in October 2010 for hearing loss and was referred to an otolaryngologist "but couldn't follow up with them." (*Id.*). On examination, Dr. Chavan noted that plaintiff's left tympanic membrane was retracted. (Tr. 448). Dr. Chavan again referred plaintiff to an otolaryngologist and indicated she would order an MRI of the eighth cranial nerve if the tinnitus did not get better in six weeks. (Tr. 450). Dr. Chavan noted that plaintiff was a former alcoholic who had been sober for the last year and attended AA meetings. (*Id.*). Attending internist Wendy Benedict, M.D., noted that plaintiff would benefit from hearing aids but she had no insurance or money to obtain them. (*Id.*). Plaintiff did not want an antidepressant and was continued on low-dose Xanax (anti-anxiety medicine) and Ambien (sleep aid). (Tr. 451).

In June 2011, Dr. Chavan noted that plaintiff was scheduled to see an otolaryngologist in July. (Tr. 476). Dr. Chavan ordered an MRI of the eighth cranial nerve. (*Id.*). Dr. Chavan noted that plaintiff would be weaned off Xanax and Ambien and started on trazodone. (Tr. 477). The MRI was unremarkable except for minimal bilateral cerebral white matter disease, which

"likely represents minimal chronic small vessel ischemic disease." (Tr. 499). In August 2011, Dr. Chavan noted that an otolaryngologist saw plaintiff in July 2011 and determined that she qualified for hearing aids. (Tr. 521). However, plaintiff "doesn't have money to pay co-pay." (*Id.*).

In November 2011, Dr. Chavan noted that plaintiff was recently hospitalized after a suicide attempt but was not currently suicidal. (Tr. 538). On examination, Dr. Chavan noted that plaintiff was depressed and tearful. (*Id.*). Dr. Chavan noted that plaintiff had been sober for the last year but started drinking again in October 2011. (Tr. 541). Plaintiff was continued on the prescriptions for Remeron and Celexa that were started during her hospitalization. (Tr. 542). In February 2012, Dr. Chavan noted that plaintiff looked "much better" and had "job interviews in pipeline." (Tr. 564). Plaintiff was referred to a social worker because of her inability to afford the cost of medications. (*See* Tr. 568, 571). In May and November 2012 and February 2013, plaintiff denied any new symptoms and her examinations were unremarkable. (Tr. 604, 622, 711-12).

In April 2013, internal medicine resident Teresa Meier, M.D., saw plaintiff after her second hospitalization for a suicide attempt. (Tr. 701). Plaintiff reported that she was living at a homeless shelter since her discharge from the hospital. Plaintiff reported that she had been drinking for the last nine months to help her sleep but had not had any alcohol in two weeks and had returned to AA. (*Id.*). Dr. Meier continued plaintiff on prescriptions for Paxil, trazodone, and hydroxyzine (anti-anxiety medication) that she received during her hospitalization. (Tr. 702). Plaintiff requested Elavil (antidepressant) but Dr. Meier would not start her on it in light of her recent suicide attempt because of its increased risk of suicide. (*See id.*). Plaintiff was also given a referral for psychiatry/psychology. (Tr. 701, 703). Attending internist Adam Slone,

D.O., noted that plaintiff had lied to Dr. Chavan in the past about her alcohol use as she "was drinking [alcohol] for 8-9 months prior to hospitalization." (Tr. 701).

In May 2013, Dr. Chavan noted that plaintiff was scheduled to see a psychiatrist in June 2013 and was planning to go to rehabilitation for her alcohol use. (Tr. 693). Dr. Chavan noted that plaintiff had not had any alcohol for 41 days. (Tr. 694). Dr. Slone noted that plaintiff was a non-compliant patient who refused a colonoscopy and follow-up gynecological appointment and refused to take prescribed medicines other than Synthroid and psychiatric drugs. (Tr. 694).

In August 2013, plaintiff saw internal medicine resident David Foster, M.D., for an upper respiratory infection. (Tr. 672). Dr. Foster noted plaintiff's report of long-standing hearing issues from which "[s]he can hear sounds, but words are difficult to distinguish." (*Id.*). On examination, Dr. Foster noted that plaintiff had three to four perforations in the tympanic membrane of the right ear with fluid behind the membrane. (Tr. 673). Dr. Foster prescribed antibiotics and continued plaintiff's other medications. (Tr. 674). He noted that plaintiff continued to attend AA meetings. (*Id.*).

In September 2013, plaintiff complained of hip pain from "sleeping on a hard cot at the homeless shelter where she resides." (Tr. 659). On examination, Dr. Foster noted that plaintiff was a "sad-appearing woman." (Tr. 660). Her left tympanic membrane had four perforations. Her right tympanic membrane had no perforations but appeared to be sclerotic. (*Id.*). Dr. Foster noted that plaintiff "has had multiple visits to audiology and prefers to not have this issue[] examined further, as she believes no new information or help would come of it." (Tr. 661). Dr. Foster explained that an otolaryngology referral "could be accomplished and that forgoing the appointment could result in permanent hearing loss." (*Id.*). Plaintiff declined referrals for a colonoscopy and mammography. (*Id.*).

11

In January 2014, Dr. Foster noted on examination that plaintiff was a sad-appearing woman with a depressed mood and diffuse wheezing in her lungs. (Tr. 743). Dr. Foster noted a "critical" thyroid-stimulating hormone value greater than twenty, "[p]ossibly due to under treatment." (Tr. 744). Dr. Foster increased plaintiff's Synthroid dosage. Plaintiff reported that she had started seeing a psychiatrist. (*Id.*). Attending physician Dr. Benedict noted that plaintiff had not taken her Synthroid in two weeks and never picked up the refill that was called in to the homeless shelter pharmacy. (Tr. 742). Dr. Benedict noted that plaintiff was now living at Tender Mercies, a group home for homeless adults with mental illness. (*Id.*).

In July 2014, Dr. Foster noted that plaintiff denied any "new depressed moods or suicide ideation." (Tr. 729). On examination, Dr. Foster noted that plaintiff was a sad-appearing woman with a depressed mood and diffuse wheezing in her lungs. (Tr. 730).

On September 3, 2014, plaintiff went to the emergency department at Christ Hospital, complaining of injuries to her head and right arm after an assault. (Tr. 1019). Plaintiff reported that a female friend struck her on the right side of the face, causing her to fall down and land on her right arm. (*Id.*). On examination, emergency physician John Jewell, M.D., noted minimal tenderness to palpation of the soft tissue on plaintiff's left cheek as well as a slight deformity to the right wrist with tenderness diffusely. (Tr. 1021). Plaintiff was able to extend and flex all of the fingers of her right hand and her right elbow and shoulder were not tender. Range of motion of the right wrist was severely limited secondary to pain. (*Id.*). X-rays confirmed that plaintiff's right wrist was fractured. (Tr. 1021-22). Plaintiff's right arm was splinted and placed in a sling. (Tr. 1022). On September 9, 2014, plaintiff's wrist fracture was surgically repaired. (Tr. 1041).

In October 2014, Dr. Foster noted on examination that plaintiff was a sad-appearing woman with a depressed mood and diffuse wheezing in her lungs. (Tr. 1124). Attending

physician Dr. Benedict noted that plaintiff's mood had improved since the addition of Seroquel (antipsychotic used to treat major depressive disorder) to her treatment regimen. (Tr. 1123). Dr. Benedict also noted that plaintiff's thyroid-stimulating hormone value was regulated on her current dosage of Synthroid. (*Id.*).

*Dr. Nelson*

In January 2013, plaintiff was evaluated for disability purposes by consultative psychologist W. Michael Nelson, Ph.D. (Tr. 640-46). Plaintiff's chief complaints were tinnitus and depression. (Tr. 640). Plaintiff admitted to being an alcoholic, but reported that she stopped drinking 1.5 years prior to the evaluation. (Tr. 641). Plaintiff reported drinking so much at one time that she experienced blackouts, but she denied having delirium tremens. (*Id.*). Plaintiff reported that psychological problems interfered with her ability to work. (Tr. 642).

On examination, Dr. Nelson noted plaintiff was cooperative but related in a depressed fashion. Questions were repeated on a number occasions due to plaintiff's tinnitus. Dr. Nelson noted that with occasional repetitions, plaintiff seemed to understand conversational voice. Plaintiff reported crying several times a week and having difficulties in falling asleep and staying asleep. (*Id.*). Plaintiff reported "that on occasion she does not sleep for two days at a time because of the severe ringing in her ears." (Tr. 643). Plaintiff admitted to fluctuating thoughts of suicide and reported three suicide attempts. Dr. Nelson noted that plaintiff's affect and prevailing mood were depressed during the evaluation. Plaintiff reported constant feelings of tension and anxiety, but Dr. Nelson noted "no clear-cut motor manifestations or autonomic signs of anxiety" during the evaluation. (*Id.*). Dr. Nelson found that plaintiff's "overall appearance is one of dejection, discouragement, and sadness," that is "coupled with heightened levels of

anxiety and apprehensiveness." (Tr. 644). Dr. Nelson found that plaintiff's self-report data appeared reliable. (*Id.*).

Dr. Nelson diagnosed dysthymic disorder and alcohol dependence in reported remission. (Tr. 645). He assigned a GAF score of 56.[6] Dr. Nelson opined that plaintiff would have occasional difficulty in understanding, remembering, and carrying out instructions due to her feelings of distress or depression. As to plaintiff's ability to maintain attention, concentration, persistence, and pace, Dr. Nelson opined that plaintiff would "experience a subjective sense of reduced effectiveness when feelings of distress/depression increase, but objective changes at a level prompting performance concerns by others are expected only on occasion." (*Id.*). Dr. Nelson noted that during the evaluation, plaintiff had "some difficulties in concentrating on questions asked." (*Id.*). As to plaintiff's ability to respond appropriately to supervisors and coworkers, Dr. Nelson found "[o]nly some limitations in ability to conform to social expectations in a work setting . . . due to her psychological difficulties." (Tr. 646). As to plaintiff's ability to respond appropriately to work pressures, Dr. Nelson noted plaintiff's psychiatric hospitalization in October 2011 and her reported tendency to deal with stress and pressure by withdrawing. Dr. Nelson opined that plaintiff "is expected to have difficulties responding appropriately to workplace pressures due to her psychological problems." (*Id.*).

*Greater Cincinnati Behavioral Health and Dr. Skale*

On May 29, 2013, plaintiff went to Greater Cincinnati Behavioral Health ("GCBH") for mental health treatment upon referral from a homeless shelter. (Tr. 778). Plaintiff sought "treatment in an inpatient setting to help her remain off alcohol and marijuana and also to attain and maintain stable affect." (*Id.*). During her intake interview, plaintiff reported that in the past,

---

[6] Individuals with GAF scores of 51 to 60 have "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 34.

her drinking had interfered with her job performance by causing her to call in sick and not do her job duties correctly. (*See* Tr. 780). Plaintiff reported that her last use of alcohol was on April 10, 2013 and that when she uses alcohol she drinks wine or a fifth of vodka daily. (Tr. 782). Plaintiff reported that she had taken Xanax in the past for anxiety, "but she abused it and tolerated it." (*Id.*). Plaintiff reported having a hearing problem and being assisted by amplifiers in both ears. (Tr. 786).

In July 2013, it was noted that plaintiff had been admitted to a residential treatment program on May 29, 2013 and would transfer to GCBH's intensive outpatient program at the end of July. (Tr. 773). Plaintiff was diagnosed with bipolar disorder, alcohol dependence, and cannabis dependence, and was assigned a GAF score of 50.[7] (Tr. 774).

In November 2013, psychiatrist Amy Shah, M.D., noted on examination that plaintiff had poor insight and judgment, fair sleep, poor concentration, attention, and memory, and feelings of guilt, worthlessness, and hopelessness. (Tr. 754). Dr. Shah noted that plaintiff had a room to herself at Tender Mercies. (*Id.*). Dr. Shah prescribed trazodone, hydroxyzine, Abilify (antipsychotic used to treat bipolar disorder), and Paxil. (Tr. 755).

In January 2014, psychiatrist Tracey Skale, M.D., noted plaintiff's report that her hearing was impaired but she could not afford hearing aids. (Tr. 839). Plaintiff reported that she had not had any marijuana or alcohol for "about a year" and attended AA meetings four to five times a week. (*Id.*). On mental status examination, Dr. Skale noted that plaintiff's was very hard of hearing and needed to watch mouth movement and have words repeated. Plaintiff reported that she still had some depression and crying spells, but no suicidal ideation. Dr. Skale noted that

---

[7] Individuals with GAF scores of 41 to 50 have "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM-IV at 34.

plaintiff "is able to smile and joke some." (*Id.*). Dr. Skale noted that plaintiff's hearing

impairment was a "big barrier" and a lifelong problem that continued to make her sad. (Tr. 840).

Dr. Skale noted that Ronda Tuggle, plaintiff's case manager at GCBH, would help her explore

ways to obtain hearing aids. Dr. Skale discontinued trazodone, Abilify, and hydroxyzine and

prescribed Paxil and Seroquel (antipsychotic used to treat bipolar disorder). (*See id.*). Dr. Skale

noted that the anticipated duration of plaintiff's treatment was "[u]ndetermined due to serious

nature of condition." (*Id.*).

In February 2014, Dr. Skale noted on mental status examination that plaintiff was hard of

hearing and still had "some anxiety issues." (Tr. 830). Plaintiff denied any substance use. (*Id.*).

In March 2014, Dr. Skale noted on mental status examination that plaintiff was hard of hearing

and needed things repeated frequently. (Tr. 825). Plaintiff had "no true depression currently."

(*Id.*). She denied any substance use. Dr. Skale noted that plaintiff still had "some anxiety and

motivational issues but overall with improvement." (*Id.*). Dr. Skale continued plaintiff on

Seroquel and Paxil and restarted her on trazodone. (Tr. 826-27).

On March 21, 2014, Ms. Tuggle noted that "over the last few days [plaintiff] had to be

assisted to her room due to appearing to be intoxicated." (Tr. 823). Ms. Tuggle noted that

plaintiff did not smell of alcohol when they met and plaintiff reported it was her sleep

medications. (*Id.*). On April 2, 2014, Ms. Tuggle noted that plaintiff appeared to be intoxicated

because her balance was off and she appeared to be staggering when walking. (Tr. 820).

Dr. Skale endorsed an April 16, 2014 mental health assessment. (Tr. 652-55). The

assessment indicated that plaintiff's impairments or treatments would cause her to miss work

twice a month or more and her psychological symptoms would distract her for one-third of the

workday. (Tr. 653). The assessment indicated that plaintiff had repeated episodes of

decompensation. The assessment found that plaintiff had marked limitations in her ability to: (1) follow work rules; (2) understand, remember, and carry out detailed, but not complex, job instructions; (3) relate predictably in social situations; (4) interact appropriately with the general public; (5) be aware of normal hazards and take appropriate precautions; and (6) maintain social functioning. (Tr. 653-55). Further, the assessment found that plaintiff had extreme limitations in her ability to: (1) understand, remember, and carry out very short and simple instructions on a sustained basis; (2) understand, remember, and carry out complex job instructions; (3) maintain regular attendance and be punctual with customary tolerance; (4) accept instructions and criticisms from supervisors; (5) behave in an emotionally stable manner; (6) respond appropriately to changes in the work setting; (7) maintain concentration, persistence, or pace; and (8) deal with, on a sustained basis, the stress of getting to work regularly, having performance supervised, and remaining in the workplace for a full day. (*Id.*).

On May 8, 2014, Ms. Tuggle noted that plaintiff admitted to using alcohol again. (Tr. 815). On May 13, 2014, plaintiff reported to Dr. Skale that she had been depressed and panicky and started drinking vodka and beer again. (Tr. 813). Dr. Skale noted that Tender Mercies noticed plaintiff's "balance [was] off and her speech was escalated." (*Id.*). On mental status examination, Dr. Skale noted that plaintiff's affect was blunted and she had low motivation. (*Id.*). Dr. Skale increased the dosage of plaintiff's Paxil. (Tr. 814).

On June 2, 2014, Ms. Tuggle noted plaintiff's report that she went to an art gallery where alcohol was being served and blacked out. (Tr. 806). Tender Mercies staff reported that plaintiff stated "she can do what she wants [because] she is grown." (*Id.*). On June 23, 2014, Ms. Tuggle noted that plaintiff "is very intoxicated, speech slurred, off balance, staggering." (Tr. 802). On June 25, plaintiff's social worker informed Ms. Tuggle that plaintiff's "alcohol use is becoming

increased." (Tr. 801). On July 2, 2014, Ms. Tuggle noted that plaintiff had requested transportation assistance to attend a substance abuse class at the Recovery Center. (Tr. 800). Ms. Tuggle noted that plaintiff was "very agitated, behavior inappropriate, not ready, inappropriately dressed in lobby of Tender Mercies, no shoes on feet, mood inappropriate." (*Id.*). On July 14, 2014, Ms. Tuggle discussed with plaintiff an incident where plaintiff was intoxicated on the patio at Tender Mercies. (Tr. 798). Plaintiff denied being intoxicated and Ms. Tuggle "pointed out continuous episodes of intoxication may lead to loss of housing." (*Id.*). On July 17, 2014, Ms. Tuggle noted that plaintiff "is in denial of alcohol abuse and states she does not see her drinking as a problem." (Tr. 795).

On July 17, 2014, plaintiff reported to Dr. Skale that she was "still struggling with [her] drinking." (Tr. 796). Dr. Skale noted that plaintiff's "housing is now affected because [plaintiff] is coming in intoxicated and staff are concerned." (*Id.*). Dr. Skale noted that plaintiff was "not addressing her drinking" and Ms. Tuggle was concerned because she "feels [plaintiff] is not headed in a positive direction about stopping drinking." (*Id.*). Dr. Skale added episodic mood disorder and personality disorder to plaintiff's diagnoses. (*Id.*). Dr. Skale opined that plaintiff's "biggest problem is drinking and no motivation to stop or to do things to better her life." (Tr. 797). Dr. Skale noted her belief that plaintiff has "some character pathology." (*Id.*). Dr. Skale discontinued plaintiff's prescriptions for Seroquel and Paxil, continued her prescription for trazodone, and restarted plaintiff on Remeron. (*Id.*). Dr. Skale noted "that substance abuse intervention really is indicated at this time" and plaintiff was "using money from her mother to drink." (*Id.*).

On September 4, 2014, Ms. Tuggle noted that plaintiff's anxiety level was very high after she was assaulted by another resident at Tender Mercies. (Tr. 1102). On September 9, 2014,

plaintiff reported that she had stopped drinking "more than a month ago" and was attending AA meetings again. (Tr. 1097). Plaintiff reported that her "depression is pretty bad" and she was having crying spells. (*Id.*). Dr. Skale opined that plaintiff was "doing better off alcohol but still depressed and still with poor sleep." (Tr. 1098). Dr. Skale noted that plaintiff's "hearing impairment is barrier for her as is character pathology." (*Id.*). Dr. Skale discontinued plaintiff's prescription for trazodone, continued her prescription for Remeron, and restarted hydroxyzine and Abilify. (*Id.*).

In October 2014, plaintiff reported to Dr. Skale that she had been sober for 3.5 months. (Tr. 1093). Dr. Skale opined that while plaintiff still had some depression, she was "doing so much better now that she is sober." (Tr. 1094). Dr. Skale increased plaintiff's Remeron dosage "to further target her depression." (*Id.*). On November 4, 2014, Ms. Tuggle noted that plaintiff was fitted for and received hearing aids. (Tr. 1091).

On February 17, 2015, plaintiff reported to Dr. Skale that she had been sober for six months. (Tr. 1140). Dr. Skale noted that plaintiff now had hearing aids "but says she mostly hears her own voice and it is difficult to wear both of them." (*Id.*). Dr. Skale discontinued Remeron and hydroxyzine, continued plaintiff on Abilify, and restarted plaintiff on Paxil and trazodone. (Tr. 1141).

On February 18, 2015, Dr. Skale completed a mental impairment questionnaire. (Tr. 1149-53). Dr. Skale listed plaintiff's diagnoses as including an affective disorder, alcohol dependence in early remission, and a personality disorder. (Tr. 1149). Dr. Skale listed hearing impairment and hypothyroidism as physical conditions affecting plaintiff's mental health. Dr. Skale indicated that antidepressants tend to have limited efficacy for plaintiff. Dr. Skale noted the following clinical findings: isolation, low motivation, poor sleep, crying spells, and anxiety.

Dr. Skale opined that plaintiff's "biggest barrier is her hearing impairment and alleged tinnitus." (*Id.*).

The questionnaire asked Dr. Skale to consider plaintiff's limitations in various work-related activities on the following scale: mild limitation (noticeable difficulty no more than 10% of the workday or workweek); moderate limitation (noticeable difficulty 11-20% of the workday or workweek); moderately severe limitation (noticeable difficulty more than 20 percent of the workday or workweek); or severe limitation (not able to perform designated activity). (Tr. 1150). Dr. Skale indicated that plaintiff had moderately severe limitation in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (*Id.*). Dr. Skale opined that this limitation was "due to motivation, concentration, and alleged tinnitus." (*Id.*). Dr. Skale indicated that plaintiff had moderate limitations in the following activities: (1) the ability to understand and remember detailed instructions; (2) the ability to interact appropriately with the general public; (3) the ability to accept instructions and respond appropriately to criticism from supervisors; (4) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; (5) the ability to deal with normal work stress; and (6) the ability to maintain concentration, persistence, or pace. (Tr. 1150-51). As to plaintiff's social interaction abilities, Dr. Skale further opined that plaintiff "cannot hear well and has to ask repeatedly what is said," which causes her to "get[] overwhelmed and frustrated and panicky." (Tr. 1151).

Dr. Skale indicated that plaintiff would be absent from work at least four days per month because of her impairments or treatment. (Tr. 1152). Dr. Skale opined that this was due to plaintiff's avolition (i.e. severe lack of initiative or motivation), anxiety, tinnitus, and poor sleep. (*Id.*). Dr. Skale indicated that alcohol abuse contributed to plaintiff limitations "historically," but

she noted that plaintiff had been sober for nearly seven months. (*Id.*). Dr. Skale opined that even when plaintiff is totally abstinent from alcohol, she "has residual depression and anxiety without substance [use]." (*Id.*) (underlining retained).

*Tender Mercies*

In July 2014, plaintiff began attending counseling sessions with Tammy Kaiser at Tender Mercies. (*See* Tr. 1131, 1138). On July 10, 2014, Ms. Kaiser noted that plaintiff's mood/affect was depressed and she exhibited slow movements and speech. (Tr. 1138). Plaintiff reported "low motivation" and "expressed feelings of low self-worth." (*Id.*). On July 22, 2014, plaintiff reported "struggling with motivation and alcohol abuse." (Tr. 1137). Ms. Kaiser noted that plaintiff's mood/affect was elevated with expressions of some frustration. (*Id.*).

On August 14, 2014, Ms. Kaiser noted that plaintiff's mood/affect was "slightly elevated, smiling and laughing," her though process/orientation was "attentive," and her behavior/functioning was "relaxed, tired, energy level elevated some." (Tr. 1136). Ms. Kaiser described plaintiff as "receptive and engaged" during the counseling session. (*Id.*). On August 21, 2014, plaintiff reported "feeling some[what] better." (Tr. 1135).

On September 18, 2014, Ms. Kaiser noted that plaintiff's mood/affect was "elevated, states she feels 'good' in general," her though process/orientation was "attentive, logical, good insight," and her behavior/functioning was "energy level elevated, but below average." (Tr. 1134). Ms. Kaiser noted that plaintiff's wrist was broken as a result of a recent assault and that plaintiff showed a range of emotions in processing the assault. Ms. Kaiser observed that plaintiff "seems to be progressing in her goals to better self and actively seeking/pursuing interests that have typically helped her cope before," such as art. (*Id.*). On September 25, 2014, Ms. Kaiser noted that plaintiff's mood/affect was "elevated, humorous" and her behavior/functioning was

"smiling, energy level high." (Tr. 1133). Ms. Kaiser noted that she "made [plaintiff] aware of the marked difference in her mood and energy level, pointed out how her artwork seems to rejuvenate her spirits." (*Id.*). Ms. Kaiser observed that plaintiff was "making notable progress" and her "motivational level [was] high." (*Id.*).

### E. Specific Errors

In her first assignment of error, plaintiff argues the ALJ erred in assessing the functional limitations caused by plaintiff's hearing impairment and mental health conditions. (Doc. 7 at 4-6). In the second assignment of error, plaintiff contends the ALJ failed to give proper weight to the opinions of Dr. Skale and Dr. Nelson. (*Id.* at 6-10). In the third assignment of error, plaintiff argues the ALJ erred in finding her alcohol use to be material. (*Id.* at 10-11). In the fourth assignment of error, plaintiff contends the ALJ erred in assessing her credibility, subjective complaints, and pain. (*Id.* at 11-13). In the fifth assignment of error, plaintiff argues the ALJ erred by posing improper hypotheticals to the VE. (*Id.* at 13-14). Because it is potentially dispositive of plaintiff's appeal, the Court will first consider plaintiff's assignment of error concerning the opinion of treating physician Dr. Skale.

### 1. Substantial evidence does not support the ALJ's assessment of Dr. Skale's opinion.

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). "The treating physician doctrine is based on the assumption that a medical professional who has dealt

with a claimant and his maladies over a long period of time will have a deeper insight into the

medical condition of the claimant than will a person who has examined a claimant but once, or

who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th

Cir. 1994).

"Treating-source opinions must be given 'controlling weight' if two conditions are met:

(1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic

techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the]

case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20

C.F.R. § 404.1527(c)(2)). *See also Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). If the ALJ

declines to give a treating source's opinion controlling weight, the ALJ must balance the factors

set forth in 20 C.F.R. § 404.1527(c)(2)-(6) in determining what weight to give the opinion. *See*

*Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544. These factors include the length, nature and

extent of the treatment relationship and the frequency of examination. 20 C.F.R. §

404.1527(c)(2)(i)-(ii); *Wilson*, 378 F.3d at 544. In addition, the ALJ must consider the medical

specialty of the source, how well-supported by evidence the opinion is, how consistent the

opinion is with the record as a whole, and other factors which tend to support or contradict the

opinion. 20 C.F.R. § 404.1527(c)(3)-(6); *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.

"Importantly, the Commissioner imposes on its decision makers a clear duty to 'always

give good reasons in [the] notice of determination or decision for the weight [given a] treating

source's opinion.'" *Cole*, 661 F.3d at 937 (citation omitted). *See also Wilson*, 378 F.3d at 544

(ALJ must give "good reasons" for the ultimate weight afforded the treating physician opinion).

Those reasons must be "supported by the evidence in the case record, and must be sufficiently

specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating

source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937 (citing SSR 96-2p, 1996 WL 374188 at *5 (1996)). This procedural requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Gayheart*, 710 F.3d at 376 (quoting *Wilson*, 378 F.3d at 544).

The ALJ gave "some weight" to Dr. Skale's February 2015 assessment. (Tr. 21). The ALJ noted Dr. Skale's finding that plaintiff had a moderately severe limitation in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (Tr. 21, 1150). However, the ALJ discounted these limitations because Dr. Skale based them in part on plaintiff's hearing and motivation:

> [Dr. Skale] did indicate that [plaintiff's] hearing and motivation would present her with some moderately severe limitations. The undersigned notes that [plaintiff's] motivational level is affected by her mental health symptoms, but the fact that Dr. Skale noted that specifically indicates that she believes that [plaintiff's] attitude and motivation may also be factors that are not affected by [plaintiff's] mental health impairments. Additionally, as far as the undersigned can tell, Dr. Skale is not an audiology expert, which means that her assessments concerning [plaintiff's] hearing are of limited value.

(Tr. 21). The ALJ noted that Dr. Skale "is a treating source and is obviously familiar with [plaintiff's] condition and her course of treatment." (*Id.*). The ALJ found that many of the limitations identified by Dr. Skale "are related to [plaintiff's] alleged hearing problems and not strictly due to her mental functioning." (*Id.*). The ALJ noted that the assessment defined moderate limitations as occurring 11-20% of the workday and, thus, "it cannot be established that any moderate limitation is in effect exactly for 20% of the workday but more than likely would be for less given the range." (*Id.*).

Plaintiff argues the ALJ erred in discounting Dr. Skale's comments concerning plaintiff's hearing based on Dr. Skale not being an audiologist. (Doc. 7 at 8). Plaintiff contends the ALJ failed to give good reasons for not giving Dr. Skale's opinion controlling weight. (*Id.* at 8-9).

Plaintiff argues that a proper weighing of the regulatory factors for evaluating opinion evidence should result in Dr. Skale's opinion receiving the most weight. (*Id.* at 10).

The Commissioner responds that the ALJ gave good reasons for not giving Dr. Skale's February 2015 opinion controlling weight and adequately weighed the regulatory factors in deciding to give that opinion only some weight. (*See* Doc. 14 at 9-10). The Commissioner argues that the ALJ "appropriately recognized that there was no indication in the record to suggest that Dr. Skale had any particular expertise in evaluating hearing impairments, and noted that Dr. Skale's assessments concerning Plaintiff's hearing were of limited value." (*Id.* at 10).

Here, the ALJ did not give controlling weight to Dr. Skale's February 2015 opinion that plaintiff would be limited for more than 20% of the workday in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (*See* Tr. 21). Dr. Skale opined that her opinion as to this limitation was "due to motivation, concentration, and alleged tinnitus." (Tr. 1150). Dr. Skale further opined that plaintiff would be absent from work at least four days per month due to avolition, anxiety, tinnitus, and poor sleep. (Tr. 1152). The reasons the ALJ gave for rejecting these opinions—that Dr. Skale believes plaintiff's motivation is not affected by her mental impairments and Dr. Skale is not a hearing specialist—are not good reasons.

First, the ALJ's conclusion that Dr. Skale believes plaintiff's motivation is unrelated to her mental impairments is pure speculation and is inconsistent with Dr. Skale's opinion and treatment records. In her opinion, Dr. Skale noted low motivation as a clinical finding. (Tr. 1149). Further, Dr. Skale opined that plaintiff would be absent from work at least four days per month due to avolition. Avolition is a precise psychiatric term defined as "a lack of initiative or motivation, *see Constable v. Peake*, 2008 WL 4694608, *5 n.5 (Vet. App. Sept. 30, 2008) (citing

http://bipolar.about.com/od/glossary/g/glavolition.htm retrieved Sept. 15, 2008), and it is

observed in schizophrenia, *see Boothe v. Quarterman*, 2008 WL 1771919, *10 n.7 (S.D. Tex.

Apr. 15, 2008)[.]" *Edwards v. Comm'r of Soc. Sec.*, 654 F. Supp.2d 692, 699 n.9 (W.D. Mich.

2009). In her treatment records, Dr. Skale noted plaintiff's motivational issues not as unrelated

to plaintiff's mental impairments, but as indicative of plaintiff's mental status. For example, in

March 2014, Dr. Skale noted in describing plaintiff's mental status that plaintiff still had "some

anxiety and motivational issues." (Tr. 825). In May 2014, Dr. Skale noted on assessment of

plaintiff's mental status that plaintiff's affect was blunted and she had low motivation. (Tr. 813).

In July 2014, when Dr. Skale added episodic mood disorder and personality disorder to

plaintiff's diagnoses, she noted that plaintiff had "no motivation to stop [drinking] or to do things

to better her life." (Tr. 796-97). This influenced Dr. Skale's belief that plaintiff has "some

character pathology." (Tr. 797). In February 2015, Dr. Skale noted that plaintiff had "little

motivation to do her art secondary to depression." (Tr. 1140). Thus, Dr. Skale's opinion and

treatment notes suggest that she considered plaintiff's lack of motivation to be a symptom of her

mental illness, not unrelated to it. Accordingly, Dr. Skale's comments concerning the impact of

plaintiff's motivation level on Dr. Skale's opinion is not a good reason for declining to give that

opinion controlling weight.

Second, while it is true that Dr. Skale is not a hearing specialist, this is also not a good

reason to decline to give controlling weight to her mental health opinion. Dr. Skale did not treat

plaintiff's hearing loss and she did not assess the severity of plaintiff's hearing issues. Instead,

she commented on the impact of plaintiff's hearing loss on her mental health, which Dr. Skale

was qualified to do as a specialist in psychiatry. For example, Dr. Skale frequently noted

plaintiff's hearing loss in assessing plaintiff's mental status. (*See* Tr. 796, 813, 825, 830, 839,

1093, 1097, 1140). In January 2014, Dr. Skale characterized plaintiff's hearing impairment as a lifelong problem that continued to make her sad. (Tr. 840). In September 2014, October 2014, and February 2015, Dr. Skale noted that barriers to plaintiff's mental health treatment included her "hearing impairment" and "character pathology." (Tr. 1094, 1098, 1141). Thus, Dr. Skale's consideration of plaintiff's hearing impairment in assessing her mental health limitations is not a good reason for the ALJ to decline to give that opinion controlling weight.

Further, even if Dr. Skale's February 2015 opinion is not entitled to controlling weight, the ALJ's consideration of the regulatory factors does not support his decision to give her opinion only "some weight." As the ALJ noted, "Dr. Skale is a treating source and is obviously familiar with [plaintiff's] condition and her course of treatment." (Tr. 21). In fact, Dr. Skale had a longstanding treatment relationship with plaintiff and examined her frequently. *See* 20 C.F.R. § 404.1527(c)(2)(i)-(ii); *Wilson*, 378 F.3d at 544. The ALJ's emphasis on Dr. Skale's lack of specialization in audiology was misplaced. (*See* Tr. 21). The ALJ failed to recognize that Dr. Skale's psychiatric specialty qualified her to render her February 2015 opinion concerning the limitations in plaintiff's mental functioning. *See* 20 C.F.R. § 404.1527(c)(5). Further, the ALJ failed to assess the supportability and consistency of Dr. Skale's opinion. *See id.* § 404.1527(c)(3)-(4). In short, the ALJ failed to properly evaluate Dr. Skale's opinion under the regulatory factors.

Accordingly, because the ALJ neither gave good reasons for rejecting Dr. Skale's opinion nor properly weighed the regulatory factors, plaintiff's second assignment of error should be sustained as to Dr. Skale's opinion.

**2. The Court need not reach plaintiff's remaining assignments of error.**

It is not necessary to address plaintiff's remaining assignments of error. Because this case should be remanded for the ALJ to reconsider and reweigh the medical opinions of record, this may impact the remainder of the ALJ's analysis, including the RFC assessment, the materiality of plaintiff's alcohol use, plaintiff's credibility, and the proper questions to be raised before a VE. In any event, even if these assignments of error have merit, the result would be the same, i.e., remand for further proceedings and not outright reversal for benefits. *Mays v. Comm'r of Soc. Sec.*, No. 1:14-cv-647, 2015 WL 4755203, at *13 (S.D. Ohio Aug. 11, 2015) (Report and Recommendation) (Litkovitz, M.J.), *adopted*, 2015 WL 5162479 (S.D. Ohio Sept. 3, 2015) (Dlott, J.).

**III. This matter should be reversed and remanded for further proceedings.**

In determining whether this matter should be reversed outright for an award of benefits or remanded for further proceedings, the undersigned notes that all essential factual issues have not been resolved in this matter. *Faucher v. Sec'y of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). On remand, the ALJ should (1) properly weigh the medical opinions of record; (2) reassess plaintiff's RFC, her credibility, and the materiality of her alcohol use; and (3) pose an appropriate hypothetical or hypotheticals to a VE after properly weighing the medical opinions and reassessing plaintiff's RFC.

**IT IS THEREFORE RECOMMENDED THAT**:

The decision of the Commissioner be **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

Date: _8/7/17_          Karen L. Litkovitz
                        United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

LAURA J. BRUCE,                                    Case No. 1:16-cv-758
    Plaintiff,                               Black, J.
                                                   Litkovitz, M.J.

    vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of

the recommended disposition, a party may serve and file specific written objections to the

proposed findings and recommendations.  This period may be extended further by the Court on

timely motion for an extension.  Such objections shall specify the portions of the Report objected

to and shall be accompanied by a memorandum of law in support of the objections.  If the Report

and Recommendation is based in whole or in part upon matters occurring on the record at an oral

hearing, the objecting party shall promptly arrange for the transcription of the record, or such

portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the

assigned District Judge otherwise directs.  A party may respond to another party's objections

**WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in

accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140

(1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).